# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RODNEY COLEMAN, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 09-CV-690-PJC |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Rodney Coleman ("Coleman"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Coleman appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Coleman was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on March 16, 2009, Coleman was 40 years old. (R. 17, 22). He was incarcerated at the time of the hearing, and he testified by telephone. (R. 19-22). Coleman estimated that he had been incarcerated about six to eight months before the date of the hearing. (R. 22). He had previously been incarcerated and had been released in approximately November 2006. (R. 22-23). He completed eleventh grade in school, and he obtained a GED. (R.

22).

Coleman testified that he had difficulty working due to blindness in his right eye and his medications. (R. 23). He lost the sight in his right eye when he was stabbed, and this incident happened in approximately 1990. (R. 23-24). He was 100% blind in his right eye. (R. 29-30). Due to this, he had no depth perception. (R. 30). His left eye required corrective lenses for reading or seeing up close. (R. 24, 30-31). His medications were for paranoid schizophrenia and depression. (R. 24). When he was released from custody in November 2006, he attempted to work through a temporary agency, but he injured himself by running into things due to his poor eyesight and lack of depth perception. (R. 24-25).

Coleman testified that while he was able to drive, he did not drive because his license was suspended. (R. 26). He described himself as a loner, but he also testified that he had lots of friends before he was incarcerated. (R. 28). He said that his experience in the penitentiary had left him paranoid and untrusting of anyone. (R. 28-29). He took medication for insomnia, and it helped him sleep. (R. 29).

A progress note from the Oklahoma Department of Corrections (the "DOC") dated October 19, 2005 is hand-written and not totally legible. (R. 184). It mentions "voices, "command," and "hurt people." *Id.* The Axis I[1] diagnosis was psychotic disorder not otherwise specified. *Id.* It appears that perhaps another diagnosis was post-traumatic stress disorder ("PTSD") in remission, but that is not completely clear. *Id.* Axis II diagnosis was deferred. *Id.* The plan was to decrease

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

2

the hallucinations by starting Seroquel and reevaluating in 60 days. *Id.* On November 23, 2005, Coleman reported increased paranoia, and his Seroquel was increased. (R. 183). Progress notes on December 21, 2005 and February 8, 2006 indicated that Coleman was doing well. (R. 181-82).

On August 22, 2006, Coleman complained of not sleeping well even with his medications. (R. 180). It appears that his medications were adjusted. *Id.* On September 26, 2006, Coleman was doing well, and his medications were adjusted. *Id.* An entry on November 1, 2006 said that Coleman was "okayed for all jobs @ this time," and referred him to mental health services. (R. 151). On November 8, 2006, Coleman was again doing well, and his medications were adjusted. (R. 179). On November 16, 2006, Coleman was seen at a discharging institution approximately one week before his discharge, and he was advised regarding continuing on his medications after his release. (R. 178).

It appears that Coleman did an intake evaluation with Family & Children's Mental Health Services ("F&C Services") on December 27, 2006. (R. 212-30, 281-307). Coleman's Axis I diagnosis was recurring major depression disorder. (R. 217). Coleman identified depression, anxiety, and paranoid thoughts as his reasons for seeking services. (R. 221). His global assessment of functioning ("GAF")[2] was assessed as 56. (R. 228). Coleman saw Tracy Loper, M.D. at F&C Services on January 31, 2007 for pharmacological management. (R. 230-31). Dr. Loper gave Coleman an Axis I diagnosis of schizoaffective disorder and rated his GAF as currently 46, with the highest last year of 56. (R. 231). He restarted Coleman on Seroquel. *Id.* On March 7, 2007, Dr.

---

[2]"The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" *Langley v. Barnhart*, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004), *quoting* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000).

Terri Stonehocker at F&C Services adjusted Coleman's medications to address a side effect of "twitching." (R. 232, 236). On May 4, 2007, Coleman saw Dr. Stonehocker for an "emergency" appointment because he was out of medications and becoming paranoid. (R. 311). At a July 13, 2007 appointment with Dr. Stonehocker, Coleman reported that he had auditory hallucinations to hurt people even when he was taking Seroquel. (R. 370). At the time of the appointment, Coleman reported he had been off his medications for about one week. *Id.* On September 20, 2007, Coleman reported to Dr. Stonehocker that he was having more auditory hallucinations, plus visual hallucinations. (R. 373). Dr. Stonehocker increased Coleman's medications. *Id.* On October 26, 2007, Coleman said he was less paranoid and was sleeping at night because of his medications. (R. 374).

It appears that a new treatment plan was entered into at F&C Services with Coleman on January 10, 2008. (R. 377-86). The treatment plan indicated that Coleman's Axis I diagnosis had been changed to schizophrenia, paranoid type, as of July 6, 2007. (R. 385). His GAF was assessed as 50, with his highest GAF in the past year as 56. (R. 386).

Coleman was apparently seen by agency consultant Alison Hansen, O.D. for an eye examination on January 23, 2007. (R. 145). Coleman had no vision in his right eye, and his left vision was 20/70 or 20/80 uncorrected, and 20/30 or 20/40 corrected. *Id.*

Coleman was seen by agency consultant Stephanie Crall, Ph.D. on February 15, 2007 for a mental status examination. (R. 250-54). After reviewing Coleman's history, Dr. Crall made the following statements:

> In the opinion of this evaluator, [Coleman's] ability to engage in work-related mental activities, such as sustaining attention, understanding, and remembering and to persist at such activities was likely substantially impaired. Likewise, his ability to adapt to a competitive work environment was likely substantially impaired.

4

(R. 252). Dr. Crall stated her Axis I diagnoses as schizoaffective disorder, depressive type; chronic PTSD; and cocaine dependence in sustained full remission. (R. 253). On Axis II, she stated "No Diagnosis, Antisocial Personality Disorder Features." *Id.*

Nonexamining agency consultant Karen Kendall, Ph.D. completed a Psychiatric Review Technique form on May 9, 2007. (R. 255-68). For category 12.04, Dr. Kendall noted Coleman's depressive syndrome, and for category 12.06, she noted his PTSD. (R. 258, 260). For category 12.08, she noted his antisocial traits, and for category 12.09 she noted cocaine dependence in remission. (R. 262-63). For the "Paragraph B Criteria,"[3] Dr. Kendall assessed Coleman with a moderate degree of limitation in his activities of daily living, in his social functioning, and in his concentration, persistence or pace, with no episodes of decompensation. (R. 265). In the "Consultant's Notes" portion of the form, Dr. Kendall briefly summarized Coleman's incarceration and history of psychiatric treatment while in DOC custody. (R. 267). She summarized his treatment at F&C Services, as well as his mental status examination with Dr. Crall. *Id.* She considered Coleman's report of symptoms to Dr. Crall to be very different from his report to F&C Services. *Id.* Dr. Kendall also summarized Coleman's activities of daily living, saying that some of his lack of social ability was due to his long period of incarceration. *Id.* She noted that Coleman was able to follow instructions well, and his F&C Services records indicated that his medications were

---

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

controlling his target symptoms well. *Id.*

For the Mental Residual Functional Capacity Assessment form, Dr. Kendall found that Coleman was moderately limited in five categories, including his ability to understand, remember and carry out detailed instructions, his ability to maintain attention and concentration for extended periods, his ability to interact appropriately with the general public, and his ability to respond appropriately to changes in the work setting. (R. 269-70). In the narrative conclusions, Dr. Kendall stated that Coleman was able to perform simple and some more complex tasks under ordinary supervision. (R. 271). She said that he could relate appropriately for incidental work purposes, but should avoid frequent contact with the general public. *Id.* She said Coleman was able to adapt to work settings. *Id.*

Nonexamining agency consultant Thurma Fiegel, M.D. completed a Physical Residual Functional Capacity Assessment form on May 10, 2007. (R. 273-80). She found no limitations except for the visual limitation of no depth perception. (R. 276). She cited to the examination of Dr. Hansen as the support for her conclusions. *Id.*

The administrative record includes a Mental Status Form dated July 6, 2007 that appears to have been completed by Annie Brandon, case manager at F&C Services, and signed by Dr. Stonehocker. (R. 320). The form stated that Coleman experienced isolation and had trouble relating to people at all times. *Id.* It said that he experienced severe anxiety, paranoia, panic attacks, and auditory hallucinations at all times. *Id.* It said that he had severe memory difficulties that affected Coleman's ability to carry out tasks independently, and that Coleman also had severe difficulty maintaining appropriate social interaction. *Id.*

**Procedural History**

Coleman protectively filed an application on November 29, 2006 seeking supplemental security income under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 94-96). The application was denied initially and on reconsideration. (R. 39-42, 48-50). A hearing before ALJ Lantz McClain was held March 16, 2009 in Tulsa, Oklahoma. (R. 17-35). By decision dated May 26, 2009, the ALJ found that Coleman was not disabled. (R. 9-16). On August 27, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four,

a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

At Step One, the ALJ found that Coleman had not engaged in any substantial gainful activity since his filing date of November 29, 2006. (R. 11). At Step Two, the ALJ found that Coleman had severe impairments of blindness in his right eye, schizoaffective disorder, and PTSD. *Id.* At Step

---

where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Three, the ALJ found that Coleman's impairments did not meet a Listing. *Id.*

The ALJ determined that Coleman had the RFC to do a full range of work at all exertional levels with the following nonexertional limitations: "He cannot perform work that requires vision in both eyes[, and he] can perform only simple repetitive tasks with only incidental contact with the public." (R. 12). At Step Four, the ALJ found that Coleman had no past relevant work. (R. 15). At Step Five, the ALJ found that there were jobs that Coleman could perform, taking into account his age, education, work experience, and RFC. *Id.* Therefore, the ALJ found that Coleman was not disabled from November 29, 2006. (R. 16).

## Review

The undersigned agrees with Coleman's argument that the ALJ had an obligation to discuss the consulting report of Dr. Crall, and therefore the ALJ's decision is reversed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley,* 373 F.3d at 1119.

As an examining consultant opinion, rather than a treating physician opinion, the report of Dr. Crall did not come under the deferential standard set out above. Instead, the requirement was that the ALJ must consider the opinion evidence and, if the ALJ rejected it, he must provide specific

legitimate reasons for the rejection. *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished), *citing Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003). *Doyal* cited to the Commissioner's own regulations and rulings that require the ALJ to consider every medical opinion. *See* 20 C.F.R. § 416.927(d) ("Regardless of its source, we will evaluate every medical opinion we receive."); and SSR 96-5p, 1996 WL 374183 ("[O]pinions from any medical source about issues reserved to the Comissioner must never be ignored."). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing* SSR 96-8p, 1996 WL 374184.

>Dr. Crall's report included medical opinions about Coleman's RFC:

>In the opinion of this evaluator, [Coleman's] ability to engage in work-related mental activities, such as sustaining attention, understanding, and remembering and to persist at such activities was likely substantially impaired. Likewise, his ability to adapt to a competitive work environment was likely substantially impaired.

(R. 252). Dr. Crall's opinions regarding Coleman's RFC needed to be considered by the ALJ. The Commissioner emphasizes that the ALJ referred to the diagnoses of Dr. Crall at Step Two of his decision in deciding what Coleman's severe impairments were, and that therefore the ALJ considered Dr. Crall's report. The undersigned does not view this one reference as fulfilling the ALJ's duty to consider the opinion evidence of Dr. Crall and to address it. The Commissioner states that these opinions were consistent with the ALJ's RFC, and therefore the ALJ had a reduced burden to discuss Dr. Crall's report, *citing Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). In the view of the undersigned, it is not fair to conclude that Dr. Crall's opinions were completely consistent with the limitations the ALJ included in his RFC determination that Coleman could "perform only simple repetitive tasks with only incidental contact with the public." (R. 12). In these circumstances, in which Dr. Crall's opinion evidence was arguably more favorable to

Coleman's claim of disability than the RFC determination of the ALJ was, the ALJ was required to discuss the opinion evidence of Dr. Crall. *Sitsler*, 182 Fed. Appx. at 823 (when opinion conflicts with ALJ's RFC determination, ALJ must explain why opinion was not adopted); *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner). Because he did not fulfill this obligation, the ALJ's decision will be reversed to give him an opportunity to do so.

Because the error of the ALJ related to the issue of Dr. Crall's report requires reversal, the undersigned does not address the other issues raised by Coleman. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Coleman.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 10th day of December, 2010.

_____
Paul J. Cleary
United States Magistrate Judge